Opinion delivered June 23, 1888.

———————

No. 6150.

JAMES WOLFE, JR., *v.* THE STATE.

1. THEFT—EVIDENCE—LIMITATION.—In order to support a conviction for theft of hogs, the evidence must show that the offense was committed within five years next preceding the filing of the indictment. The statement of a witness that the offense was committed in "84" will be understood to mean that it was committed in the year 1884.
2. SAME—FACT CASE.—See the statement of the case for evidence which, though conflicting, is *held* sufficient to support a conviction for theft.

3. SAME—CHARGE OF THE COURT.—See the opinion for a charge of the court upon the province of the jury with respect to the weight of evidence and the credibility of witnesses, *held* erroneous, because it omits to instruct upon the rules applicable to impeachment of witnesses.

APPEAL from the District Court of Madison. Tried below before the Hon. N. G. Kittrell.

The conviction in this case was for the theft of nine head of hogs of the value of six dollars each, the property of John R. McIver, in Madison county, Texas, on the twenty-fourth day of December, 1884. The indictment jointly impleaded the appellant and Allen Wolfe, but appellant was alone upon trial. The penalty assessed was a term of two years and six months in the penitentiary.

John R. McIver was the first witness for the State. He testified that he lived in Madison county, Texas, and lived in that county in the year '84. The witness owned a stock of hogs that ranged west of the town of Madisonville, on the same range with hogs owned by the Wolfe family. The witness's mark was a crop and split in the right ear and a crop and over half crop in the left ear. Sometimes, however, he got the marks reversed, the crop and split being placed in the left ear, and the crop and over half crop in the right ear. In December of the year '84 witness lost nine head of his said hogs, the same being meat hogs, or spaed sows and barrows. The animals lost were either all sandy spotted animals, or a majority of them were of that color, and one or two black hogs. The witness was unable to say whether or not the marks of any of the hogs that he lost were on reversed ears. He knew, however, that nobody in Madison county gave the same mark that he did, and if anybody gave the reverse of his mark he did not know it. The hogs lost by witness were nearly three years old, and averaged in weight between one hundred and forty and one hundred and fifty pounds, and were worth five dollars each. They belonged to the witness, and were taken from his possession without his knowledge or consent. They were taken about December 20, '84, and witness had not seen them since. He last saw them on the range two or three weeks prior to the said December 20. Witness offered a reward for the apprehension of the man or men who took or killed his hogs, but did not make that offer to either of the Risingers nor to Snowden.

W. H. Snowden was the next witness for the State. He testified that he lived on the place of James Wolfe, Sr., in the year '84. The witness helped the Wolfes kill nine head of hogs late on the Saturday evening preceding the Christmas of '84. Witness helped the Wolfes as a hired hand, and in payment for his services received some of the meat after it was salted. While the last hog was being cleaned the witness heard a remark made by one of the parties at work that caused him to examine the mark of that hog. That mark was a crop and split in the left ear, and a crop and an over half crop in the right ear, and it was a black animal. Witness did not help take any of the carcasses into the smoke house, but after they were taken into the said house the witness went into it, and saw the defendant, using a hatchet and block, cutting up the ears of a hog. Witness did not know what the marks on those ears were. In fact, he only knew the marks in the ears of the black hog, which was the last one cleaned. A majority of the hogs killed were sandy spotted in color, but there were one or more black animals among them. The animals killed were spaed sows and barrows, were about one and a half or two years old, and would weigh from one hundred and fifteen to one hundred and forty pounds each.

The witness lived on James Wolfe, Sr.'s, place in '84 and '85, and in '86 moved to the place of John McIver. He was before the grand jury, at the May term, '85, of the district court of Madison county, but told nothing about John McIver's hogs, although he knew as much about them then as now. The grand jury did not ask him about the matter. The witness came to the town of Madisonville some time in the year '86, and about the time he got into town he heard John McIver call to Joe Atwell that he, witness, was in town, and witness was then taken before Justice of the Peace J. C. Morris, by subpoena, and made a complaint against the appellant and Allen Wolfe for the theft of McIver's hogs. Witness had no ill feelings for the Wolfe family. His wife was the niece of James Wolfe, Sr. Witness and the Wolfe family had some trouble as members of the Alliance. A charge of lying was preferred against the witness but was not sustained. The filing of those charges did not anger the witness. He was not a man who would fall out with a family because they talked about him, and then, in revenge, report them for violations of law. The witness did not tell George Mize, at old man Mize's house, just after filing the com-

plaint against defendant and Allen Wolfe, that he would not have sworn against the Wolfes if they had not tried to reduce him to the level of dogs and negroes. He denied that, at a meeting of the Alliance, a week or two before swearing out the complaint, he told Bob Worley that if the Wolfes did not quit slandering him he would balance accounts with them. The complaint against the Wolfes was not made by witness until after the complaint against him was made in the Alliance. The remark which induced the witness to examine the ears of the last hog cleaned was made by Pat Wolfe. Witness asked Pat Wolfe which of his brothers, defendant or Allen, owned the hogs being killed. Pat replied: "Neither; they belong to John McIver." The witness did not then, nor does he yet know who owned the said hogs. Neither defendant nor Allen Wolfe were present when Pat Wolfe made the remark stated. Witness and his wife at that time were staying a few days at and in the house of James Wolfe, Sr. The hogs were killed between sun down and ten o'clock p. m.

Mrs. W. H. Snowden, the wife of the preceding witness, testified, for the State, that she and her husband were staying at the house of James Wolfe, Sr., at the time of the killing of the hogs, as stated by her husband. They were not living in said house, but were staying there until the completion of a new house which was being built in the place of the old house they had previously occupied. Late on the evening that the hogs were killed, the witness saw the defendant and Allen Wolfe in the field back of the house driving up the hogs. She did not see, but heard the hogs and dogs. On the next Monday morning the witness went with her aunt, Ellen Wolfe, into the smoke house and got some hog heads to clean. They took the heads, five or six in number, into the kitchen and dining room, and placed them on a table and a bench and cleaned them. The said heads were then thrown into a big wash pot that was sitting on the fire in the kitchen fire place. No one was present with witness and her aunt while the heads were being cleaned. The ears had been removed from all of the heads before witness saw them. The hogs were killed on Saturday night before Christmas, '84. They were killed and cleaned by defendant and Allen and Pat Wolfe, and Jordan and Bud Risinger, and witness's husband. Witness knew of no hard feelings between her family and the Wolfe family, though the witness had not visited at the Wolfes since some time in '86.

J. D. Risinger testified, for the State, that late on the evening of Christmas eve (Saturday), '84, he helped kill and clean some hogs at James Wolfe, Sr.'s, house. The hogs were in the pen when the witness reached Wolfe's house. The hogs were sandy spotted and black hogs. It was the recollection of the witness that James Wolfe, Sr., and Theo. McMillan rode up to the house late on that evening. Reese Taylor, who lived at the house, was there, and H. W. Singletary came to the house while the hogs were being killed and cleaned. The hogs were killed by the witness and the defendant. For his services in helping to kill and clean the hogs, the witness received the last hog killed, from the head of which the defendant cut the ears and threw them on the ground. The witness admitted that he told J. F. Randolph that the hog he got was in the mark of the defendant, but now states that he did not know the mark of that nor of any other of the hogs killed on that evening. Witness took the hog he got to Charley Worley's house. He reached Worley's house about ten o'clock that night, and, finding Worley in bed, he took the hog into the kitchen, where he left it until morning. The hogs killed were between a year and a half and two years old, and weighed a hundred pounds and upward. Witness was before the grand jury of May, '85, but was not questioned about nor did he say anything about the said hogs. He was questioned about a particular act of fence cutting. He denied to the grand jury that he knew anything about that act of fence cutting, but subsequently went back and told the grand jury that he and James Wolfe and others cut that fence. Witness testified on James Wolfe's trial for cutting the fence that he told the grand jury that he knew nothing about the said cutting of the fence. The hogs killed at Wolfe's on Christmas eve night, '84, were killed within thirty or forty feet of the neighborhood road. Witness helped the Wolfes to kill hogs several times in the year '84.

Bud Risinger testified, for the State, that on Saturday, December 24, '84, he and Paschal Wolfe, brother of the defendant, took some hogs that had been killed on the previous day to Madisonville to sell for defendant. When they got back to the house of old man Wolfe, which was late in the evening, they found the boys slaughtering other hogs, seven or eight in number. They had already killed two of the animals. Witness helped kill and clean the others. He did not observe, nor did he know the marks on any of those hogs. On the next morning,

(Sunday), witness went back to Wolfe's house and got a hog for his services.  He had previously arranged with Charley Worley to sell him a hog weighing one hundred pounds.  The carcasses were being cut up when witness reached the house on Sunday morning, and witness observed that all the heads had been cut off.  He then remarked he wanted a hog from which the head had not been removed.  One of the boys replied: "Well, you want a hundred pound hog.  We will weigh it, and if it does not weigh a hundred pounds, you can put a head in your sack and take it along."  The carcass delivered to witness weighed exactly one hundred pounds without the head.  A hog's head will weigh from ten to sixteen pounds.  None of the hogs were large ones.  Some may have weighed less and some more than one hundred pounds.  Witness took his headless hog to Worley's house on that Sunday morning.  He was in Wolfe's smoke house on that morning, but he did not observe the hog heads with reference to whether the ears were on or off.  He thought, however, that if the ears had been cut off, he would have noticed it.  In fact witness did not remember seeing any of the heads at all.  He did not see defendant cut the ears from the hog he let J. D. Risinger have on the night before.  He observed nothing to excite his suspicion at any time.  Old man Wolfe did not tell witness that he did not like to see a headless hog taken from his place.  Had he done so witness would have thought at once that something was wrong.  Reese Taylor was at Wolfe's house on Saturday evening, and Singletary and Sid Winter came there at different times while the hogs were being killed.

Charles Worley testified, for the State, that Jordan Risinger brought the carcass of a hog to his, witness's, house about ten o'clock one night in '84.  He took the hog into the kitchen, and witness went into the kitchen immediately behind him and saw that the ears of the animal had been cut off.  Several young people were at the witness's house that night, and they broiled and ate pieces of the meat.  On the next morning (Sunday), witness told Theo. McMillan about the hog being brought to his house.  About two weeks before this the witness was at a new house on the Mathis place, and saw James Wolfe, Sr., and his sons, Allen and Pat Wolfe, drive a bunch of hogs past that house.  Sam Lindley and others were at work on the house at the time.  Bud Risinger brought a hog to witness's house on the day after Jordan Risinger brought his hog.  Bud's hog had no

head, and the carcass weighed one hundred and five pounds. Old man Wolfe frequently drove hogs by witness's house, but witness saw him do so but the one time mentioned, while the new house was being built.

The State rested.

James Wolfe, Sr., the father of the defendant, was the first witness for the defense. He testified that he remembered the killing of the hogs on his place, on Christmas eve, '84, by the defendant and the other boys named by the previous witnesses. The witness and his son Pat drove those hogs to the house late on that evening. They drove them up once before—about two weeks before—but they got out of the pen and went off. The boys told witness on that Saturday evening that, late as it was, they were going to kill them that night, as they might get away again. Witness told them to do as they pleased, but that he was too tired and it was too late for him to have any thing to do with the job. None of those hogs belonged to John R. McIver. Two of them belonged to witness, two of them belonged to Allen Wolfe, and three of them belonged to the defendant. None of McIver's hogs were ever killed on witness's place except those killed there by McIver himself, and he had often killed hogs on witness's place. Witness had a large number of hogs in the woods, and often rode the range looking after them. He had often helped McIver mark and spae his hogs, and knew his, McIver's, hogs as well as he knew his own. The hogs of McIver and the witness's were of the same stock, and were flesh marked alike. McIver got his hogs from the estate of P. H. Wilkerson, who lived with witness for many years prior to his death. All of the hogs killed on witness's place in '84 were young hogs, from a year and a half to two years old, not one being above two years of age. Defendant let J. D. Risinger have a hog on the night of the killing, but if its ears were cut from the head, the witness did not know it. Bud Risinger came to the house next morning and got a hog which he said he was going to take to Charley Worley. Witness told him that he did not like to have a headless hog taken from his place, and he replied that Worley only wanted a hundred pound hog, and that the carcass he had weighed just that much without the head. Witness did not see any ears cut from the hog heads, and if there had been any earless heads in his smoke house, he thought he would have observed them. The witness drove the hogs that

were killed on Christmas eve night, past the new house on the Mathis place, about two weeks before the killing; and again on the evening of the killing. Witness did not, on the first trial of Allen Wolfe for the theft of these hogs, testify that it was Paschal Wolfe and himself who drove up the hogs on the evening of the killing. He testified that it was himself and Paschal or Pat Wolfe, he did not know which, who drove them up. The hogs killed on that Christmas eve were a year and a half or two year olds, and weighed from one hundred to one hundred and fifteen pounds each. Witness went hog hunting with Theo. McMillan as often as twice during the winter of '84; and on one of those hunts saw John Robinson in the bottom killing hogs, but that was not on Christmas eve. Reese Taylor, the school teacher, was living at witness's house at the time that the hogs were killed. Singletary came to the house to see witness on business that evening. Witness had no recollection of any other visit to his house by Singletary, either before or after the killing of the hogs. He, witness, did not hunt hogs with Theo. McMillan all day on Christmas eve, '84. Nobody in the neighborhood, so far as witness knew, gave the reverse of John McIver's brand. W. H. Snowden and his wife did not live in the witness's house at any time during '84 or '85, but when the hogs were killed, were living in a new house the witness had built for them. They may have stayed at witness's house over night a time or two, but if so, witness did not remember it.

Mrs. Ellen Wolfe, the mother of the defendant, testified, in his behalf, that her husband and young son Pat drove a bunch of hogs to the house on the evening of Christmas eve, 1884, and the boys, including defendant, killed and cleaned them, working late into the night. Witness did not know who owned those hogs, but supposed they belonged to her husband and sons. She did not know the ear marks they were in, nor would she have been able to tell had she seen the marks, as she could not tell one mark from another by name or designation. Mrs. Snowden never at any time in her life helped witness clean any hog heads, either with the ears on or off. The witness never in her life cleaned or cooked as many as five or six hog heads at one time. She rarely ever cooked or cleaned a hog head, and almost invariably, when hogs were killed on the place, gave the heads to her washwoman on her wash bill. The witness had no recollection of ever seeing a hog head with the ear cut off, unless she may have seen such a head served cooked on the table. The witness denied most

positively that she and Mrs. Snowden went into the smoke house on Monday, or at any other time, and got five or six, or one, or any other number of hog heads, with or without ears, and took them to the dining room, kitchen or elsewhere, and cleaned them, or put them in a pot on a kitchen fire, or anywhere else. As a matter of fact, there was no chimney in the kitchen, and never had been, and the cooking at witness's house had been done for twenty years on a stove.

Reese Taylor testified, for the defense, that he boarded at the house of James Wolfe, Sr., in December, '84, and taught school in the neighborhood. Mr. Singletary was at Wolfe's house in the winter of '84, but witness could not say at what time. The Wolfes killed hogs several times during the said winter, but if they ever killed any hogs but shoats or young hogs the witness did not know of it. Witness was often about the smoke house when hogs were being killed, and at other times, but he never saw a hog's head with the ears cut off in that smoke house. Snowden and his wife never at any time, while witness boarded at Wolfe's, lived in Wolfe's house. Witness was not related to the Wolfe family. He knew nothing whatever about the McIver hogs.

H. W. Singletary testified, for the defense, that he went to the house of James Wolfe, Sr., late on the evening of Saturday, December 24, '84, and found the boys about the place killing hogs. Witness got down from his horse and assisted in putting the first hog killed into the scalding barrel. He remained at the house thirty minutes or longer, his business being to see Mr. Wolfe, Sr., and get some money due him, on which to go to Bryan on the next day. The hogs killed at Wolfe's house on that evening were young animals, and would range in weight from ninety to one hundred and twenty pounds. None of them looked to be older than eighteen months. Witness did not testify, on a former trial of this case, that the hogs would weigh from sixty-five to one hundred pounds. He did not tell Joe Atwell, when he served the subpœna on him, witness, that he knew nothing about the case, and that he did not get off his horse when he went to Wolfe's and found them killing hogs.

Pat Wolfe testified, for the defense, that on Christmas eve, '84, he and his father went to Beef-pen Prairie and got a bunch of hogs, which they took home, arriving late in the evening. W. H. Snowden did not ask witness who owned those hogs. The witness did not on that evening. nor at any other time, tell W.

H. Snowden, nor Mrs. Snowden, nor anybody else, that those hogs belonged to John R. McIver.

County Judge E. L. Byers testified that he was a member of the grand jury organized at the spring term, '85, of the Madison county district court. W. H. Snowden and Jordan Risinger were both before that grand jury; both were questioned about the killing of the McIver hogs, and both swore that they knew nothing whatever about the matter.

Mr. Brimberry, another member of the grand jury, testified as did Judge Byers.

George Mize testified, for the defense, that a short time after filing the complaint against the defendant and Allen Wolfe, W. H. Snowden, at the house of witness's father, told witness that had not the Wolfes tried to reduce him to the level of the dogs and negroes, he would never have sworn against them.

Bob Worley testified, for the defense, that, at a meeting of the Alliance, a short time before the filing of the complaint against the Wolfes, W. H. Snowden told him that if the Wolfes did not quit slandering him he would balance accounts with them.

The record, at this point, contains the following entry: " Date of complaint and indictment to show time of commencement of prosecution was admitted. The complaint was sworn to by W. H. Snowden before J. C. Morris, Justice of the Peace, Precinct No. 1, Madison county, Texas, on July 28, 1886. The indictment was presented and filed on November 15, 1886. This is inserted by direction of the court."

The defense rested, and the State recalled John R. McIver as its first witness in rebuttal. He testified that, on the former trial of this case, James Wolfe, Sr., testified positively that Paschal Wolfe was with him when he drove the hogs to his house. Singleton testified, on the first trial, that the hogs were small in size, and would range in weight from sixty-five to ninety pounds. Witness was before the grand jury at the May term, '85, of the district court, but was not questioned about and did not report the loss of his hogs, to the said grand jury.

N. G. Kittrell, the judge presiding on this trial, testified, for the State, as follows: " By reference to my charge I find that James Wolfe, Sr., and Paschal Wolfe are named in it; and on the second trial I find that Pat or Paschal drove, or assisted James Wolfe, Sr., in driving the hogs up; and from the first charge I infer that it was Paschal that he stated was with him. I infer that if the first charge was incorrect the attorneys

for the defense would have excepted to it. I do not know whether or not Pat is an abbreviation of Paschal. I am satisfied that on the first trial James Wolfe testified that Paschal assisted him in driving the hogs up, or I would not have it so written in my charge."

N. J. Williams testified, for the State, in rebuttal, that he was a member of the grand jury of May, '85. He had no recollection whatever that either W. H. Snowden or Jordan Risinger were questioned about the theft of McIver's hogs. So far as the witness knew that grand jury questioned nobody about McIver's hogs; nor was the theft of those hogs reported to or investigated by that grand jury.

Frank Johnson testified, for the State, that he was at the house of Wolfe, Sr., about 9 o'clock a. m., on Christmas, '84. He saw Mrs. Snowden on the gallery at that hour, and left her there at 11 o'clock. He did not see Snowden.

Theo. McMillan testified, for the State, in rebuttal, that he hunted hogs with James Wolfe, Sr., two or three times in December, '84. The last time they went they found no hogs, but saw John Robinson on Caney creek, and when they got back to Wolfe's house late that evening they found the defendant and Allen Wolfe at home, one of whom told the old man that he had been waiting for the dogs to get up some hogs. On the next morning, which was Sunday, Charley Worley told witness that Jordan Risinger brought the carcass of a hog to his house the night before with the ears cut from the head. Witness was with old man Wolfe from 9 o'clock in the morning until late in the evening on the day before Worley told him about Risinger bringing the earless hog to his house. On cross examination this witness testified that the reputation of W. H. Snowden for truth and veracity was not good, and that charges for lying were still pending against him, Snowden, in the Alliance.

W. D. McDonald testified, for the State, that he was a member of the grand jury of May, 1885. He remembered that W. H. Snowden and Jordan Risinger were before that grand jury about fence cutting, but if they were questioned about McIver's hogs witness did not remember it.

W. H. Snowden and his wife testified, for the State, in rebuttal, that Pat Wolfe told them that the hogs killed on Christmas eve night belonged to John McIver.

*M. Y. Randolph* and *J. F. Randolph* and *Sneed, Pendexter & Burleson,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

Hurt, Judge. This conviction is for the theft of hogs, the property, as alleged, of John R. McIver.

The one question presented by counsel for appellant is, was the offense committed within limitation? The statement of facts makes all the witnesses say that the transaction was in "'84;"— not " 1884"—but that the hogs were taken in "'84." It was necessary to a legal conviction for the State to prove that the offense was committed within five years of the presentment of the bill of indictment. On this point the witnesses say, speaking of the date of the offense, that it occured in '84. This is sufficient; for if in any part of 1884 it would be within limitation.

In common parlance "'84" means "1884." It is preposterous to indulge the idea that the witnesses were relating matters which occurred in 1784, a hundred years ago. The Bingham case is not in point. In that case the time proved was "187." This was not a common manner of expressing the date of a transaction. When, however, it was said that the time of the transaction was in "'84," "'85," "'86," "'87" or "'88," we know the date with as much certainty as if the 18 had been prefixed. We are not to be understood that such loose methods would be tolerated in indictments.

There is a very serious conflict in the evidence, and if the writer had been called upon to pass, in the first instance, upon the guilt of the appellant, a different result would have been reached. The evidence as to what the brother of the appellant said about the hogs was clearly inadmissible; but not being objected to, the matter is beyond the revisory powers of this court. Looking alone to that which supports the verdict, we can not say that it is insufficient. The jury were the judges of the credibility of the witnesses and the weight to be given to their testimony; and they may have altogether rejected or disbelived the testimony in favor of the accused.

We believe, however, that under the peculiar facts of this case, the following charge was unfair to the appellant: "It is your peculiar province to determine all questions of fact, and you are the sole and exclusive judges of the weight of the evidence, and the credibility of the witnesses; and when, if at all,

witnesses disagree in their testimony, it is for you to reconcile such disagreement, as far as possible, and if you can not do so, it is for you to determine from all the facts and circumstances in evidence, and the relation of the witnesses to the defendant or injured party, their interest in the case, their intelligence and their manner of testifying, to whose testimony you will give credit, and to what extent." The defendant introduced several witnesses who swore to the general bad character for truth and veracity of one of the most important witnesses for the prosecution. When enumerating the matters and things to which the jury might look in passing upon the credibility of the witnesses, and the weight to be given to their evidence, this fact (impeachment) was omitted. In this, under the peculiar facts of this case, we think there was error of a character well calculated to prejudice the rights of the defendant, and is therefore reversible error, although not excepted to at the trial.

*Reversed and remanded.*

Opinion delivered June 23, 1888.